## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**ROBERT G.,**[1]

      **Plaintiff,**

**v.**                                                      **Case No. 3:21-CV-774-NJR**

**KILOLO KIJAKAZI, Acting**
**Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Robert G. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

### PROCEDURAL HISTORY

Plaintiff applied for a closed period of DIB on November 26, 2018, alleging an onset date of December 9, 2017. (Tr. 46.) Plaintiff's claim was based on the following injuries and conditions: blind in right eye with depth issues; left knee replacement and manipulation; right elbow surgeries; shredded TFC tendon in wrist; back pain; and right shoulder pain. (*Id.*) The application initially was denied on May 9, 2019 (Tr. 57), and was denied upon reconsideration on October 8, 2019 (Tr. 73). Plaintiff timely requested a hearing, and a hearing was held before Administrative Law Judge Stacey Foster on

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

September 21, 2020. (Tr. 29-43.)

The ALJ issued an unfavorable decision on December 14, 2020, finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. 123-22.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-3.)

Plaintiff now appeals that decision directly to this Court, raising three points: (1) the medical evidence objectively supports a closed period of disability; (2) the ALJ's reasons considered isolated activities rather than his objective medical treatment; and (3) the vocational expert's testimony supports an award of a closed period of DIB. (Doc. 18). The Commissioner timely filed a brief in opposition (Doc. 22).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the

ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

DISCUSSION

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth five questions for the ALJ to consider in assessing whether a claimant is disabled: (1) Is the claimant presently unemployed?

(2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him unable to perform his past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### I.   Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing on September 21, 2020. (Tr. 29-43.) Vocational expert Sandra Buff also testified by telephone.

Plaintiff testified that he has a high school education and has worked as a

construction laborer. (Tr. 33.) In December 2016, after surgery on his left knee, the doctor told him the cartilage damage and arthritis in his knee was so bad that his knee would not last more than a year or two. (Tr. 34.) Plaintiff went back to work anyway. (*Id.*) A day or two later, he already could not walk again, so the doctor scheduled him for a knee replacement in December 2017. (*Id.*) The knee replacement did not go well, as he could no longer bend or shake his knee. (*Id.*) Plaintiff underwent physical therapy five days a week and had to use a wheelchair, then crutches, then a cane. (*Id.*) He used the cane for six months. (*Id.*) He had another procedure called a manipulation, where the surgeon tried to pull out and reattach the ligaments and tendons, and cleaned out his joints. (Tr. 35). After that surgery, Plaintiff returned to physical therapy five days a week but received no relief. (*Id.*).

During physical therapy for his knee, Plaintiff's back was injured. (*Id.*) A specialist confirmed it was a bulging, ruptured disc. (*Id.*). Plaintiff began receiving shots in his back and began seeing a massage therapist and chiropractor. (*Id.*). His doctors talked to Plaintiff about back surgery, but Plaintiff did not want surgery on his back. (*Id.*). Instead, the doctors did an ablation where they burned the nerves in his back to give him a few months of relief. (*Id.*). Between the knee surgery and back ablation, Plaintiff could not walk, bend over, or put his shoes on. (*Id.*) Plaintiff testified that his back would spasm, causing it to lock up. (Tr. 38). He has fallen several times because his back was frozen and he could not move. (*Id.*)

Plaintiff also had a right ulnar nerve transposition and bicep repair in January 2017. (Tr. 36). The surgeon reattached the bicep and re-routed the nerve in his dominant

elbow. (*Id.*) The doctor advised Plaintiff to have an elbow replacement, but Plaintiff declined after his knee replacement did not go well. (*Id.*) During a subsequent surgery in July 2018, the surgeon cleaned out bone chips and spurs in his elbow joints. (*Id.*)

After his elbow surgery, Plaintiff was able to bend and straighten his elbow more than before, but he had no strength in his arm and could not carry anything. (Tr. 37). He could not use a fork with his right hand for several months. (*Id.*) Plaintiff testified that he cannot raise his arm all the way and he cannot sleep at night due to nightmares that his arm has been cut off at work from a bad injury. (*Id.*). He has pain and the tip of his fingers feel like they are on fire. (*Id.*). His nerves and muscles are too weak to pick something up or use a screwdriver. (*Id.*). He testified that he is very restricted with his right arm. (*Id.*)

As a result of his neck, back, and knee pain, Plaintiff testified that he became a couch potato and gained 75 pounds. (Tr. 39.)

Plaintiff testified that he went back to work in May 2019 because he owed his ex-wife $19,400 in lawyer fees and back child support, and he had his own bills to pay. (*Id.*) His employer asked if he was interested in a job with no physical work, and Plaintiff thought he could handle it. (*Id.*) The job would require him to go over drawings and handle paperwork in a trailer. (*Id.*) The employer also was fine with him staying home or laying down for a bit if needed. (Tr. 39-40.) Plaintiff testified that he still hurts constantly, but he forced himself to go to work rather than lose his house or be unable to provide for his children. (Tr. 40.) When asked whether he could have taken on the non-physical job sooner, Plaintiff testified "no," he actually pushed himself too quickly in the beginning and should have waited a couple more months. (Tr. 40-41.)

Sandra Buff, the vocational expert, testified that Plaintiff's past work was classified as a semiskilled construction laborer. (Tr. 41.) Buff testified that an individual with Plaintiff's physical limitations would not be able to perform Plaintiff's past work, but that such an individual could perform other sedentary, unskilled jobs such as a final assembler, a table worker, or an eye glass assembler. (Tr. 41-42). Buff testified, however, if the person were unable to use his right dominant hand for any reaching, handling, fingering, or overhead reaching, then the person could not perform those jobs. (Tr. 42).

## II.    Relevant Medical Records

Plaintiff began seeing Dr. Ted Jefferson, an orthopedic surgeon, in May 2016 for complaints of right elbow pain and left knee pain. (Tr. 948). Dr. Jefferson scheduled Plaintiff for electromyography and nerve conduction velocity tests and injected his left knee with Lidocaine, Marcaine, and Dexamethasone. (Tr. 949). In June 2016, Plaintiff reported to Dr. Jefferson that he had intense pain in his right elbow at times and that he would wake with pain, numbness, and tingling. (Tr. 950). Plaintiff also complained of continued left knee pain and stated that pain relief from the shot he received lasted less than a week. (*Id.*) Dr. Jefferson performed right ulnar nerve transposition surgery on January 26, 2017. (Tr. 313-14.)

In October 2017, Dr. Jefferson diagnosed Plaintiff with severe, end stage osteoarthritis of the left knee. (Tr. 262.) Dr. Jefferson opined that the severity of Plaintiff's symptoms and the advanced nature of the osteoarthritis left little hope for continued conservative treatment, and that a total knee replacement would be best. (*Id.*). Plaintiff had the left knee replacement arthroplasty on December 15, 2017. (Tr. 263.) On January

2, 2018, Plaintiff reported swelling in his left knee and severe pain; he required a walker to assist his ambulation. (Tr. 271.) At a follow-up appointment on January 30, 2018, Plaintiff had pain with palpation of the left knee and pain when moving his knee. He also had a decreased range of motion. Dr. Jefferson noted that Plaintiff may need another operation for arthroscopic debridement and manipulation. (Tr. 274.)

On February 6, 2018, Dr. Thomas Staton wrote a report for the Laborers National Pension Fund stating that Plaintiff is totally and permanently disabled from performing his prior work as a laborer. (Tr. 777.) Dr. Staton reported that Plaintiff can stand for 20 minutes at a time, can walk a couple of blocks using a cane, can lift 10 pounds without problems, but cannot perform work that requires repetitive bending and squatting. (*Id.*) Dr. Staton further noted Plaintiff has significant pain in his knee, hip, and lower back, gets only minor relief from medicine, and goes to physical therapy five times a week with little to no improvement. (Tr. 778.)

On February 26, 2018, Plaintiff saw Dr. Jefferson for a follow-up on his left knee and for complaints of right elbow pain that radiated into his arm and shoulder. (Tr. 277.) Dr. Jefferson noted that Plaintiff used a cane to walk, he had pain with palpation and with range of motion of his left knee, and he again had a decreased range of motion of his left knee. Dr. Jefferson explained that Plaintiff's pathology indicated he would be best served by arthroscopic debridement and manipulation of his left knee, and Plaintiff agreed to schedule the procedure. (Tr. 278.)

On March 8, 2018, Dr. Jefferson performed arthroscopic debridement and manipulation on Plaintiff's left knee. (Tr. 283.) At a follow-up appointment on March 21,

2018, Plaintiff reported he had been attending physical therapy five days a week. (Tr. 285.) Plaintiff used a cane to ambulate. (*Id.*) On April 18, 2018, Plaintiff returned to Dr. Jefferson, who provided him with a referral for continued physical and/or occupational therapy. (Tr. 288.)

On May 30, 2018, Plaintiff presented to the Orthopaedic Institute of Western Kentucky. (Tr. 811.) Plaintiff complained of a sharp, burning, constant pain in his elbow that was worse with movement, along with a decreased range of motion (*Id.*) Dr. Jefferson had told Plaintiff he needed an elbow replacement, and Plaintiff wanted a second opinion. (*Id.*) A CT scan showed loose bodies in the posterior and anteromedial joint, as well as some arthritic changes in the medial and lateral compartments. (Tr. 818.) Plaintiff elected to proceed with surgical removal of the loose bodies. (Tr. 819.) On July 19, 2018, Dr. Spencer Romine performed a right elbow arthrotomy with removal of multiple loose bodies. (Tr. 872-73.)

On August 3, 2018, Plaintiff returned to the Orthopaedic Institute of Western Kentucky for a post-op visit. (Tr. 820.) His range of motion was improving on his elbow but he also complained of right shoulder pain and loss of range of motion. Plaintiff was found to have signs of impingement and a positive Jobe's test. (Tr. 821.) By September 2018, Plaintiff reported more shoulder pain than elbow pain. (Tr. 825.) An MRI revealed acromioclavicular joint arthritis and subacromial impingement syndrome. (Tr. 830.)

On October 15, 2018, Dr. DeWeese at the Orthopaedic Institute of Western Kentucky reviewed Plaintiff's x-rays and found osteoarthritis in his right hip and arthritis in L5-S1 of his lumbar spine. Dr. DeWeese ordered an MRI of Plaintiff's lumbar spine,

which showed partial sacralization of L5, a rudimentary disk at the L5-S1 level, degenerative disk disease at L4-L5, mild disk bulging at L1-L2, L2-L3, and L3-L4. (Tr. 840). At L4-L5, Dr. DeWeese found degenerative disk disease with disk desiccation and an annular fissure along the posterior central annulus with central protrusion of disk material with mild ventral indentation of thecal sac. (*Id.*). He also found mind central spinal stenosis. (*Id.*) Plaintiff had a lumbar epidural on December 7, 2018. (Tr. 851.)

After his lumbar epidural, Plaintiff continued to have back pain. (Tr. 861.) On January 24, 2019, and February 7, 2019, Plaintiff had lumbar medial branch nerve blocks. (Tr. 864-67.) On March 7, 2019, and March 20, 2019, Plaintiff had radiofrequency ablation of the medial branch nerves at L3-L4, L4-L5, and L5-S1. (Tr. 868.) The ablation gave Plaintiff a 70 to 80 percent improvement in his pain, allowing him to work in his yard and consider trying to go back to work. (Tr. 883.)

### III.    State Agency Examiners

Lenore Gonzalez, M.D., reviewed Plaintiff's initial application for DIB. Dr. Gonzalez found Plaintiff could perform sedentary exertion with occasionally and frequently lifting 10 pounds; standing two hours and sitting six hours; never climbing ladders/ropes/scaffolds or crawling; occasionally climbing ramps/stairs, stooping, kneeling, and crouching; frequently balancing; frequently reaching in any direction with the right upper extremity; frequently handling and fingering with the right upper extremity; limited near and far acuity for work requiring precise detail and seeing small objects at a distance; and avoiding concentrated exposure to extreme cold, wetness, vibration, and hazards. (Tr. 45-57.)

At the reconsideration level, Frank Mikell, M.D., noted that Plaintiff is blind in his right eye and walks with a cane for balance and stability due to his left knee giving out frequently. (Tr. 68, 70.) He further found that Plaintiff is limited in his ability to reach in any direction with his right arm and handling/fingering with his right hand. (Tr. 69.) Overall, Dr. Mikell found Plaintiff's statements regarding his symptoms to be partially consistent with the evidence. (Tr. 67.) While Plaintiff demonstrated some impairments that could be expected to produce some limitations in function, the medical records did not fully support the severity of limitations as indicated on Plaintiff's Activities of Daily Living scale. (*Id.*)

## DECISION OF THE ALJ

In reaching her decision, the ALJ considered hearing testimony from Plaintiff and the impartial vocational expert. She also considered Plaintiff's medical records and the opinions of Dr. Gonzalez, Dr. Mikell, Dr. Jefferson, and Dr. Staton.

At step one, the ALJ concluded Plaintiff did not engage in substantial gainful activity from December 9, 2017, to May 2019. (Tr. 15).

At step two, the ALJ concluded that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine; degenerative joint disease of the left knee; and degenerative joint disease of the right elbow and right shoulder. (Tr. 16.) These impairments, the ALJ noted, significantly limit Plaintiff's ability to perform basic work activities. The ALJ did not find Plaintiff's history of left carpal tunnel release to be more than a minimal limitation upon work-related activities. (*Id.*) She also did not find Plaintiff's right eye blindness to be a severe impairment, as Plaintiff is able to drive, and

he reads and looks at drawings. (*Id.*) Furthermore, the vocational expert testified that even if Plaintiff were limited to performing work with monocular vision, he would still be able to perform the jobs identified as being representative occupations that a person with Plaintiff's residual functional capacity would be able to perform. (*Id.*)

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the regulations. (*Id.*) The ALJ noted that Plaintiff's condition has not resulted in an inability to ambulate effectively or the disorganization of motor function as defined in listing level criteria. (*Id.*) Further, objective testing has not shown evidence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication. (*Id.*)

At step four, the ALJ determined Plaintiff is unable to perform his past relevant work as a construction laborer, as it is considered heavy exertion and a semi-skilled activity. (Tr. 20.) The ALJ relied on the vocational expert's testimony that a person with Plaintiff's residual functional capacity would not be able to perform this job. (*Id.*)

Finally, at step five, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), with certain physical limitations. (Tr. 16-17.) In making this finding, the ALJ considered Plaintiff's testimony regarding his symptoms and found that his medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 17.) The ALJ concluded, however, that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*)

Upon reviewing Plaintiff's medical records, the ALJ found that, with regard to Plaintiff's left knee, Plaintiff experienced pain and swelling that was aggravated by activity. (Tr. 17-18.) For example, Plaintiff reported stiffness and soreness after walking a lot on a trip to St. Louis. (Tr. 18.) The following month, Plaintiff had arthroscopic debridement and manipulation under anesthesia. (*Id.*) He subsequently drove a tractor with a clutch and traveled to St. Louis to see a ballgame. (*Id.*). He also worked at the ball fields and hauled off trees that he cut. (*Id.*) Plaintiff reported stiffness and soreness after these activities, but he also reported that he had not taken pain medication in a few days. (*Id.*). Imaging reflected a possible loosening of his left knee prosthesis, and a December 2018 CT scan showed small bone fragments along the posterior aspect of the joint likely related to the prior osteotomy and a small amount of fluid in the suprapatellar bursa. (*Id.*). The ALJ noted, however, that Plaintiff's physician felt this was a nonspecific finding and he wanted to rule out lumbar radiculopathy. (*Id.*)

Later in 2018, Plaintiff reported worsening back pain and stiffness along with his knee pain, especially when carrying something heavy. (*Id.*). X-rays confirmed osteoarthritis of the right hip, and an MRI showed degenerative changes, an annular tear, and moderate foraminal narrowing bilaterally at L4-5. (*Id.*) Plaintiff had an epidural steroid injection in his back, which helped temporarily. (*Id.*) He then had radiofrequency ablation in March 2019, which provided good relief. (*Id.*). The ALJ noted that Plaintiff has not required surgical intervention for his back pain. (*Id.*)

With regard to Plaintiff's elbow pain, the ALJ noted Plaintiff's right ulnar nerve transposition in January 2017. (*Id.*) After the surgery, Plaintiff had some limitation of

motion along with mild tingling in the ulnar distribution and positive Tinel's and Phalen's signs. (*Id*.) Imaging showed moderate degenerative changes and loose bodies in the elbow, and Plaintiff underwent surgery in August 2018 to remove the loose bodies. (*Id*.). Instead of further surgery, injections were recommended. (*Id*.). Upon follow up, Plaintiff lacked only approximately five degrees of extension. (*Id*.)

Finally, with regard to Plaintiff's right shoulder, the ALJ considered that Plaintiff has been diagnosed with osteoarthritis, and imaging as confirmed arthritis and a possible labral tear. (*Id*.) Plaintiff has had some limitation of motion and a slight reduction in strength. (*Id*.).

With regard to Plaintiff's testimony, the ALJ noted that Plaintiff reported continued pain after returning to work, even in his supervisory role. (Tr. 19.) But despite reporting chronic pain, Plaintiff drove a tractor, traveled to St. Louis, worked at the ball fields, and cut trees. While Plaintiff did not feel able to return to heavy exertional work as a construction laborer, in May 2019, he began working as a construction supervisor. (*Id*.) Ultimately, the ALJ was not persuaded that Plaintiff had significantly improved as of May 2019. (*Id*.) Instead, she believed Plaintiff's condition stabilized before May 2019 considering he returned to activities shortly after his surgical procedures. (*Id*.) While Plaintiff was described as having a limping gait and made ongoing complaints of pain, the ALJ was persuaded that Plaintiff would have been able to perform sedentary work prior to May 2019. (*Id*.)

The ALJ was not persuaded by the opinion of Frank Mikell, the state agency consultant, as Mr. Mikell was not designated as a medical doctor. The records confirm,

however, that Dr. Mikell is, indeed, a medical doctor. (Tr. 75.)

The ALJ was somewhat persuaded by the opinion of Dr. Gonzalez because she was a listed medical physician. (*Id.*) In sum, the ALJ found, the medical records support the physical limitations found by Dr. Gonzalez. (*Id.*)

The ALJ was not persuaded by Dr. Jefferson's statement that, as of February 27, 2017, Plaintiff could return to work and activities without restrictions (Tr. 20.) The ALJ noted that this recommendation was made shortly after a knee procedure, and Plaintiff complained of increased pain after returning to normal activities. Imaging corresponded with Plaintiff's subjective complaints. (*Id.*) Therefore, the ALJ found, some limitations are appropriate. (*Id.*).

Finally, the ALJ was somewhat persuaded by the opinion of Dr. Staton, who opined that Plaintiff was permanently disabled from performing his past work as a laborer. (*Id.*) The ALJ noted that Plaintiff's records do support a restriction on heavy work such as using a jackhammer. (*Id.*) The ALJ was not persuaded, however, that the use of a cane was necessary for an extended period following the surgical procedure. (*Id.*)

Based on the testimony of the vocational expert, the ALJ concluded that, "considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 21.)

Considering all of the above, the ALJ found the Plaintiff was not under a disability, as defined in the Social Security Act, from December 9, 2017, through the date of her decision. (Tr. 22.)

DISCUSSION

## I.      The ALJ's Decision Is Not Supported by Substantial Evidence.

Plaintiff argues that the overwhelming medical evidence supports a closed period of disability from December 9, 2017 through May 2019. Plaintiff asserts he had three knee surgeries, two of which occurred during the closed period. He also had two dominant arm elbow surgeries, one of which occurred during the closed period. He underwent physical therapy both before and after his surgeries to regain functioning. Following his June 2018 physical therapy, he was assessed as limited to 40 to 60 percent mobility and 51.43 percent impairment of his left knee. In November 2018, he was still struggling with knee and back pain. Ultimately, the epidural injection on December 7, 2018, the medial branch blocks on January 24 and February 7, 2019, and his spinal nerve ablation on March 7 and March 20, 2019, enabled him to return to a sedentary job.

Plaintiff asserts there is no medical record evidence to suggest he was able to return to work during the closed period. Rather, there was substantial medical evidence that he was either undergoing surgery, recovering from surgery, undergoing physical therapy and rehabilitation, and following up with doctors to try to control his pain. Plaintiff disputes the ALJ's conclusion that he "only" needed injections and conservative treatment for his back, considering he had the nerves in his spinal column cut. This treatment, he argues, constitutes more than mere "injections." Furthermore, the ALJ looked at each impairment singly, rather than the combined effect of his knee, hip, and back pain and his combined shoulder and elbow pain. Plaintiff argues that the ALJ ignored evidence that he was unable to use his right dominant arm during the periods

Page 16 of 22

he was recovering from the elbow surgeries, and that he frequently had issues with pain, lifting, and stretching his arm straight and overhead.

The Court agrees. The ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity," Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and has the RFC to perform sedentary work with the additional limitations that he could: never crawl or climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, climb ramps or stairs, and operate foot controls with his left leg; frequently, though not constantly, reach, handle, and finger with his right arm, but not reach overhead; and avoid concentrated exposure to extreme cold, wetness, vibration, and hazards.

Based on this conclusion, it is unclear to the Court whether the ALJ was considering Plaintiff's current RFC, or whether she considered Plaintiff's RFC during the closed period of disability in light of his surgeries, treatments, and related recovery periods. *See Lenora W. v. Kijakazi*, No. 3:21-CV-50178, 2022 WL 4386242, at *3 (N.D. Ill. Sept. 22, 2022) (quoting *Gholston v. Astrue*, No. 11 CV 4671, 2012 WL 1463553, at *15 (N.D. Ill. Apr. 27, 2012) (the ALJ erred by not considering whether the claimant was unable to work for a 12–month continuous period in light of the claimant's cancer treatment and related recovery periods).

The ALJ also included the following boilerplate statement regarding her assessment of Plaintiff's credibility:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause

the alleged symptoms; however, the claimant's statements concerning the
intensity, persistence and limiting effects of these symptoms are not entirely
consistent with the medical evidence and other evidence in the record for
the reasons explained in this decision.

(Tr. 17.) The Seventh Circuit has "criticized the inclusion of such boilerplate language as
'meaningless' because the language fails to connect the conclusory statement with
objective evidence in the record or explain what the ALJ relied on when making her
determination. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), *as amended* (Aug. 20,
2014). Using such language does not automatically discredit the ALJ's conclusion, but the
ALJ must point to sufficient reasons, grounded in the evidentiary record, to justify her
credibility determination. *Id.* Here, the ALJ failed to do so.

The ALJ noted Plaintiff's total knee replacement in December 2017, but then
pointed out certain activities Plaintiff did, like walking during a trip to St. Louis in
February 2018, which made him stiff and sore. The ALJ then notes that Plaintiff had
arthroscopic debridement and manipulation under anesthesia the following month, but
subsequently drove a tractor with a clutch, traveled to St. Louis to see a ball game, worked
at the ball fields, and cut trees and hauled them off. She also observed that Plaintiff
reported not taking his pain medications when discussing these incidents.

In referencing Plaintiff's activities after his knee replacement, the ALJ
cherrypicked notes from Plaintiff's physical therapy, where he explained to his therapist
why he might be a little more sore than normal. But the ALJ failed to note that Plaintiff
was instructed, by his doctors, to increase his activity. And while the ALJ observed that
Plaintiff, at times, did not take his pain medicine when reporting this additional pain and
soreness, there is only one instance where Plaintiff stated he hadn't taken pain pills in a

few days. (Tr. 756.)

With regard to Plaintiff's back pain, the ALJ notes that Plaintiff had worsening back pain in 2018 and was diagnosed with osteoarthritis of the right hip, degenerative changes, an annular tear, and moderate foraminal narrowing bilaterally at L4-5. She then notes that while the epidural helped only temporarily, Plaintiff received "good relief" from the radiofrequency ablation in March 2019 and has not since required surgical intervention. Instead, Plaintiff has managed his pain conservatively with physical therapy and injections. The ALJ fails to consider, however, that Plaintiff is seeking a closed period of disability that ends in May 2019, just two months after he had radiofrequency ablation on the nerves in his spine. The fact that he has not since required surgical treatment says nothing of his ability to work from December 2017 to May 2019.

Likewise, with regard to Plaintiff's elbow, the ALJ notes that Plaintiff had moderate degenerative changes and loose bodies in his right, dominant elbow. He had surgery in August 2018 to clean up his elbow and remove the loose bodies. Afterward, only injections were recommended, not further surgery. The ALJ's decision is silent as to how Plaintiff's elbow issues and surgery would have affected his ability to work from December 2017 to May 2019.

Lastly, the ALJ reported that Plaintiff has been diagnosed with osteoarthritis of the right shoulder, and his strength and range of motion is limited. She further noted that Plaintiff testified he cannot raise his arm above his shoulder.

Yet, despite these findings, the ALJ concludes that Plaintiff would have been capable of performing lesser exertional work that limits lifting and standing/walking

during the relevant period at issue. That is, Plaintiff was capable of performing sedentary work activity with limited reaching and postural activities. In doing so, the ALJ has failed to build a logical bridge between the evidence and her conclusions. *See Murphy*, 759 F.3d 811 at 815. The ALJ summarized the medical findings regarding Plaintiff's left knee, back, right elbow, and right shoulder, but did not consider the combined effect of these ailments or explain how that evidence supports a finding that Plaintiff could perform sedentary work during the closed period of disability. *See Lenora W.*, No. 3:21-CV-50178, 2022 WL 4386242, at *3 ("[M]erely summarizing medical evidence is not the same thing as analyzing it and explaining how the evidence supports the conclusion that the claimant is not disabled."); *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (the regulations require consideration of the combined effect of all of the claimant's ailments, regardless of whether any such impairment, if considered separately, would be of sufficient severity).

The ALJ also appears to have completely disregarded Plaintiff's testimony about his medical issues. The ALJ stated: "As noted above, the claimant has had a knee replacement and some back and hip pain attributable to degenerative changes. However, despite reporting chronic pain, the claimant engaged in activities such as driving a tractor, traveling to St. Louis, working at the ball fields, doing yardwork, and cutting trees." (Tr. 19.) Again, the ALJ cherrypicked this evidence from physical therapy records, never asked Plaintiff about these activities at the hearing, and failed to summarize any of Plaintiff's other testimony.

Perhaps that is because Plaintiff's testimony is contrary to her conclusion. Plaintiff

testified that after his knee replacement surgery, he saw three physical therapists five days a week. Despite the physical therapy, Plaintiff found no relief for his knee, leading to the second surgery. Plaintiff's knee issues, combined with his back pain, kept Plaintiff from walking or even being able to put on his shoes. Plaintiff also testified that, after his elbow surgery in July 2018, he could not carry anything or even use a fork to feed himself using his right hand. He further testified that the tips of his fingers burn and he lacks the muscles and nerves to twist a screwdriver. The ALJ improperly ignored this evidence. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.").

Finally, the ALJ erred in failing to consider the opinion of Dr. Mikell because she was not convinced he was a medical doctor. But Dr. Mikell *is* a medical doctor, and he opined that Plaintiff should limit reaching in any direction with his right arm and handling or fingering with his right hand. (Tr. 69.) The vocational expert testified that if Plaintiff could not use his right hand for any reaching, handling, or fingering, then Plaintiff would not be able to perform the other jobs in the national economy identified by the vocational expert. While there is a difference between limiting use of one's hand and not being able to use one's hand at all, by completely discounting Dr. Mikell's opinion, the ALJ failed to consider and explain how Plaintiff's limited ability to use his right hand would affect his ability to perform sedentary work.

By failing to acknowledge this contrary evidence, the ALJ has deprived the Court "of any means to assess the validity of the reasoning process." *Id.* at 1124. Without a

logical bridge between the evidence and the ALJ's conclusion, the Court must remand this matter to the Commissioner for further proceedings.

CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:   March 21, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**